**UNITED STATES of America,**
**Plaintiff,**

v.

**Rodney Lee FLOWERS, Defendant.**

**Case No. 10–20149.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 17, 2011.

Terrence R. Haugabook, United States Attorney's Office, Detroit, MI, for Plaintiff.

Federal Defender, Federal Defender Office, Detroit, MI, for Defendant.

## OPINION AND ORDER

LAWRENCE P. ZATKOFF, District Judge.

### I. INTRODUCTION

This matter is before the Court on the Government's Motion to Dismiss the Indictment (Docket # 27), originally made in a one sentence motion filed on January 26, 2011. The "Motion and Brief to Dismiss Indictment" read, in its entirety:

> THE UNITED STATES OF AMERICA moves this Court for leave to dismiss the Indictment against RODNEY LEE FLOWERS in the above-titled case for the reason that the ends of justice would best be served by this dismissal.

The Motion to Dismiss Indictment, made one day before the date the Court had scheduled a hearing on Defendant's Mo-

tion to Suppress Evidence, did not specify whether the proposed dismissal would be with or without prejudice, nor did the Government attach a brief in support of its motion (despite the heading that suggested there was a brief). At the hearing on the Motion to Suppress on January 27, 2011, the Assistant United States Attorney on the case ("AUSA") reiterated the Government's desire to dismiss the Indictment.

The Court now addresses the Government's Motion to Dismiss the Indictment.

## II. BACKGROUND

### A. Basis for the Complaint and Indictment

Defendant is charged in a one-count Indictment with Possession with Intent to Distribute Heroin, in violation of 21 U.S.C. § 841(a)(1). The Indictment stemmed from a search warrant executed on June 9, 2009, at 26* * * Berg Rd. Apt. 14* *, Southfield, Michigan (hereinafter, the "Berg Apartment"). The search warrant was signed by Wayne County District Court Magistrate Karen Khalil of the 17th District Court (the "Magistrate") upon an application for search warrant presented by Drug Enforcement Agency ("DEA") Task Force Officer Eric Woodall ("Officer Woodall"), which application included a seven-page affidavit sworn to by Officer Woodall (the "Warrant Affidavit"). A brief summary of the relevant facts that led to the application for the search warrant (as provided by the Government) is set forth here.

In March 2009, DEA Special Agent Ron White ("Agent White") and Officer Woodall (a Redford Police Officer assigned as a Task Force Officer to DEA) began working with a confidential informant ("DEA–1") to formulate an investigation of Defendant for illegal narcotics trafficking. Agent White and Officer Woodall were working in tandem with other law enforcement personnel in their deployment of DEA–1. On May 1, 2009, DEA–1 received a free sample of heroin from Defendant. DEA–1 thereafter made two controlled purchases of heroin from Defendant, on May 7, 2009, and May 12, 2009. Prior to the each of the controlled purchases, Officer Woodall and DEA agents instructed DEA–1 to call Defendant to arrange a meeting for the purchase of heroin. As instructed, DEA–1 phoned Defendant while agents listened to (but did not record) the call, and in each instance, Defendant directed DEA–1 to meet him in the 16800 block of Hubbell Street in Detroit. Prior to meeting Defendant on each occasion, DEA–1 was searched for contraband or money with negative results. DEA–1 was then given $160 and $360 of pre-recorded funds for the prospective transactions on May 7, 2009, and May 12, 2009, respectively, and instructed to engage Defendant in conversation about purchasing a small quantity of heroin.

On May 7, 2009, on Hubbell Street, DEA–1 had a face-to-face conversation with Defendant about purchasing heroin, pursuant to which Defendant indicated he needed to go to his Southfield, Michigan apartment for the drugs. DEA–1 and Defendant, followed by Officer Woodall and other DEA agents, rode to the Southfield Apartment Complex located at 265* * Berg Road in Southfield, Michigan. Defendant went into the complex through a common door, returned shortly thereafter, got inside the vehicle, and departed the location. Defendant and DEA–1 then returned to the 16800 block of Hubbell Street. Defendant exited the vehicle and DEA–1 drove away to meet the agents at a pre-determined location. At this location, DEA–1 turned over 28 gross grams of heroin to the agents. The substance field tested positive for heroin.

At the May 12, 2009, meeting, DEA–1 again met with Defendant on the 16800 block of Hubbell Street. According to Officer Woodall, he could see Defendant hand DEA–1 an unknown item. After departing Defendant, DEA–1 met directly with an agent and turned over 28.6 gross grams of heroin. DEA–1 said he had gotten the heroin from Defendant after Defendant had retrieved the heroin from his pocket. The substance field tested positive for heroin.

During the course of the investigation, Defendant was observed driving a vehicle registered to Diana Knott at the Southfield Apartment Complex. Because the agents could not determine an accurate residential address for Defendant, they sought to follow up on the Diana Knott nexus to the apartment. On June 3, 2009, Officer Woodall went to the Manager's Office at the Southfield Apartment Complex and requested information regarding Ms. Knott's tenancy. Officer Woodall met with Ms. Tess Radjewski, the apartment manager, who would not provide any information to Officer Woodall absent a subpoena. Officer Woodall called the DEA office to request that an administrative subpoena be faxed to Ms. Radjewski. At approximately 11:55 a.m., Agent Boyle faxed the subpoena to Ms. Radjewski. Upon receipt of the administrative subpoena, Ms. Radjewski gave Officer Woodall a copy of the lease agreement for Diana Knott. Officer Woodall subsequently notified agents of his receipt of the lease information. The next day, June 4, 2009, Officer Woodall faxed the lease agreement to the DEA office from his Redford Police Department office.

Although it's not specifically mentioned in the search warrant affidavit, Agent White has informed the AUSA that, on June 9, 2009, Tess Radjewski gave the agents a key with which to access the outer security door at the Southfield Apartment Complex. Using this key, the agents and officers entered the complex and deployed the K–9 unit at the front door of apartment 14* * that Defendant shared with Ms. Knott.

Based on the foregoing information, Officer Woodall was able to obtain the search warrant on June 9, 2009. Agent White has informed the AUSA that upon obtaining the signed search warrant, the agents waited outside the apartment complex for Defendant to arrive.

Upon Defendant's arrival at the Southfield Apartment Complex, agents took him into custody, detained Ms. Knott, and advised them of their intent to execute the search warrant. Agents then used the same key previously given to them by Ms. Radjewski and re-entered through the outer security door. Once the agents entered the outer security door, they went to Defendant's apartment and executed the search warrant. After the execution of the search warrant was completed, agents confiscated: 36 gross grams of heroin from a kitchen cabinet, drug paraphernalia, residency documents for Defendant and a State of Nevada fictitious identification card bearing Defendant's image and the name Frank White.

## B. Procedural History

### 1. The Early Stages

On October 7, 2009, a Complaint against Defendant was filed and an arrest warrant was issued. On March 30, 2010, a detention hearing was held before, and an Order of Detention Pending Trial was entered by, Magistrate Judge Scheer. On April 1, 2010, the Government filed the Indictment against Defendant. On April 15, 2010, the Court issued the parties a notice to appear for Final Plea Conference Hearing on June 15, 2010. On June 8, 2010, the parties submitted, and the Court signed, a

Stipulated Order to Adjourn Final Plea Conference Hearing until July 20, 2010.

### 2. Defendant's Motion to Suppress

On June 25, 2010, Defendant filed a Motion to Suppress because he believes there are numerous errors, including material omissions and false statements made intentionally or with reckless disregard for the truth, in the Warrant Affidavit. The most critical of those allegedly material omissions and false statements include: (a) the absence from Agent White's affidavit accompanying the Complaint (the "Complaint Affidavit") of the $160 controlled buy on May 7, 2009, and (b) a different version of the transaction in a DEA report completed by Agent White as compared with the substantively identical versions set forth by Officer Woodall and Agent White in the Warrant Affidavit and Complaint Affidavit, respectively. Defendant contended that, if those false statements had been excluded from the Warrant Affidavit, the Warrant Affidavit would have been insufficient to support a finding of probable cause to issue the search warrant signed by the Magistrate. Accordingly, Defendant asserted that the evidence seized pursuant to the June 9, 2009, search should be suppressed. On July 16, 2010, the Government filed a response to the Motion to Suppress, wherein the Government asked that the Court deny the Motion to Suppress. The Government's response did not address either of the two most critical discrepancies set forth above.

### 3. Recent History

For a number of reasons, including substitution of Defendant's attorney because of a conflict of interest, the Court did not schedule the hearing on the Motion to Suppress until January 2011. On January 11, 2011, the Court issued a Notice of Hearing on the Motion to Suppress, set-ting the hearing for January 25, 2011. On January 19, 2011, the AUSA asked the Court to reschedule the hearing because he had a conflict on January 25, 2011. On January 20, 2011, the Court re-scheduled the Motion to Suppress hearing for Thursday, January 27, 2011.

From January 11, 2011, through January 25, 2011, there was no indication from any attorney that this matter would need to be adjourned, nor did anyone indicate that dismissal of the Indictment was even being considered. Then, on Wednesday, January 26, 2011, at approximately 4:15 p.m., the AUSA called the Court to announce that the U.S. Attorney's Office had decided it would be dismissing the Indictment. At 5:50 p.m. on January 26, 2011, the AUSA caused the three-line "Motion and Brief to Dismiss the Indictment," together with a proposed Order, to be filed on ECF.

On January 27, 2011, the AUSA, Defendant's new attorney and Defendant appeared before the Court at the time and date set for the Motion to Suppress hearing. Upon hearing the Government's desire to dismiss the Indictment against Defendant, the Court ordered the AUSA to file a brief in support of the Government's Motion to Dismiss Indictment. On February 9, 2011, the AUSA filed a two-page document entitled "Government's Brief in Support of Its Motion to Dismiss the Indictment With Prejudice."

### III. ANALYSIS

When the Court reviewed the Government's response brief to the Motion to Suppress, the Court was struck by the absence of any argument addressing the key arguments made by Defendant (i.e., that there were numerous inconsistencies between the Warrant Affidavit and Complaint Affidavit as compared to DEA reports prepared by Agent White

and others). In fact, as none of those inconsistencies were explained in the response brief, the Court suspected that no one affiliated with the United States Attorney's Office for the Eastern District of Michigan interviewed Officer Woodall or Agent White prior to filing the response.

Amazingly, and unfortunately, the AUSA: (1) confirmed the Court's suspicions when he spoke at the January 27, 2011, hearing, and (2) reaffirmed that position two weeks later when the Government filed the Brief in Support of the Government's Motion to Dismiss the Indictment With Prejudice. On both occasions, the Government acknowledged that neither Officer Woodall nor Agent White was debriefed by U.S. Attorney's Office representatives regarding the subject matter of the Motion to Suppress until January 26, 2011. In other words, despite having more than 15 months since the Government filed the Complaint, over 9 months from the time the Government filed the Indictment, and approximately seven months from the date Defendant filed the Motion to Suppress that identified numerous discrepancies that could not be explained simply by reading documents in the record, the AUSA waited until 24 hours prior to the hearing to debrief Agent White and Officer Woodall about the discrepancies. The Court finds this practice, whether unique to the AUSA or representative of the approach of the U.S. Attorney's Office (for the Eastern District of Michigan and/or the national office), to be abhorrent and unacceptable, particularly as it relates to the interests of justice and judicial economy.

As to the interests of justice, the Court is confronted with a situation where a defendant just spent six months in jail because the Government filed a response in opposition to a Motion to Suppress, only to

apparently change its position on the eve of the hearing. And why did the Government change its position? It appears to the Court that the Government changed its position because it failed to properly investigate the case, both before and after filing the Complaint, both before and after filing the Indictment, and both before and after filing its response in opposition to the Motion to Suppress. This is not a case where the Government suddenly was made aware of new information, or should have become aware of certain information, the day before the suppression hearing.

To the contrary, all of the allegedly inconsistent or false information that served as the basis for Defendant's Motion to Suppress was set forth in documents prepared by Officer Woodall and Agent White on or before October 9, 2009 (the date the Complaint was filed and long before the Indictment or Motion to Suppress were filed). Likewise, Officer Woodall and Agent White were available for debriefing by the Government at any time. Moreover, even if there was not a reason to debrief them prior to the filing of the Motion to Suppress, the substance of the Motion to Suppress clearly established a need for the Government to talk to Agent White and Officer Woodall to determine whether there was a reasonable explanation for the discrepancies. Thus, in this case, all of the information that the Government ultimately cited when deciding to file the motion to dismiss the Indictment existed at the time the Motion to Suppress was filed. In other words, there is no information that the Government learned for the first time, or even had reason to only learn, on January 26, 2011, the day before the hearing on the Motion to Suppress.

█ Whatever the case may be, there is no question that the interests of justice have been violated in this case. Based on

the Government's motion to dismiss the Indictment against Defendant, however, a very important question shall remain unresolved. That question is: "Which interest of justice has been disregarded?" Is it the liberty interest of a criminal defendant who unnecessarily endured a lengthy detention because of the Government's handling of this matter? Or, more likely, is it the interest of the public to be protected from a recidivist defendant engaged in narcotics trafficking because the Government chose not to go forward with a hearing that may have resulted in the Court denying the Motion to Suppress. In either situation, the Court finds that the U.S. Attorney's Office, an extension of the Department of Justice, has failed miserably in the pursuit of justice, the very task with which it the U.S. Attorney's Office and the Department of Justice are charged.

The Court also would be remiss to refrain comment on the utter disregard for the judiciary and judicial economy demonstrated by the Government, in particular the AUSA, in this case. Three situations exemplify the Court's observations. First, despite being given notice on January 11, 2011, that hearing on the Motion to Suppress would be held on January 25, 2001, the AUSA inexplicably and inconsiderately waited until January 19, 2011, to inform the Court that he had a conflict on January 25, 2011. The reason the Court finds this delay was so absurd is that the AUSA was scheduled to be at another suppression hearing in front of another judge in the Eastern District of Michigan at the same date and time—and the other hearing had been set at least a month earlier than the notice was issued in this case. In other words, the AUSA knew, or should have known, about the conflict upon receiving the Court's January 11, 2011, notice of the hearing.

Second, notwithstanding the AUSA's dilatory approach to notifying the Court of his conflict on January 25, 2011, the Court promptly re-scheduled the hearing on the Motion to Suppress. In fact, the Court did so the next day (January 20, 2011) after expending substantial effort to confirm that: (a) re-scheduling the date was necessary (because, based on the little information provided by the AUSA, it appeared possible that the issue could be resolved by simply moving the time of the January 25, 2011, hearing in this Court), and (b) all counsel could be present on the same date. Eventually, the Court altered its existing schedule so that it could accommodate the AUSA (and hold the hearing without waiting until late February or early March 2011, the earliest defense counsel would be otherwise be available), and rescheduled the Motion to Suppress hearing two days later, on Thursday, January 27, 2011.

As noted above, between January 11, 2011 (when the Court issued the notice of the hearing) and January 25, 2011, the Court had no reason to believe the hearing needed to be adjourned beyond January 27, 2011, or that dismissal of the Indictment was even being considered. Accordingly, and as any reasonable AUSA (or defense attorney) would know or could foresee, the Court's law clerk assigned to the case spent in excess of 20 hours during that period: (1) reviewing, analyzing and researching the Defendant's motion, brief in support of the motion, reply brief and exhibits in support of the same, (2) undertaking the same tasks with respect to the response brief and supporting exhibits filed by the Government, and (3) then drafting a 23–page memorandum for the Court in preparation for the hearing. Likewise, as any reasonable AUSA (or defense attorney) would know or could foresee, the undersigned spent in excess of 15 hours reviewing the law clerk's memoran-

dum and the documents relevant to the Motion to Suppress, including the briefs and key exhibits, *during that time period*. In fact, the vast majority of the undersigned's (and the law clerk's) time was expended on January 25–26, 2011, when the hearing was imminently approaching.

In the end, of course, the resources of the undersigned and his staff was needlessly and inconsiderately wasted by the Government, specifically the AUSA. In saying that the waste of judicial resources was needless, the Court does not mean needless in the sense that the hearing was never held. Rather, the waste of judicial resources was needless in the sense that any reasonable, timely effort by the AUSA either would have led him to: (1) the same conclusion over six months ago, thereby eliminating the need to schedule a hearing on the Motion to Suppress, or (2) ascertain whether the necessary witnesses could testify and explain the inconsistencies in the relevant documents, *i.e.*, that mistakes were made when seeking the search warrant but that, even absent certain information, the Warrant Affidavit would be sufficient to support a finding of probable cause to issue the search warrant. Instead, the Government did neither until the day before the hearing and, as a result, valuable judicial resources were wasted on analyzing the merits of a motion to suppress that *would never be considered solely* because of apathy, ambivalence and/or the clear disregard for judicial resources, as described above.

Third, even when the AUSA (and the U.S. Attorney's Office for the Eastern District of Michigan) finally decided on January 26, 2011, that the Government would no longer wished pursue the charge against Defendant, the Government took a fairly casual and, at times, cavalier approach toward its decision. In the Court's opinion, the Government proceeded to seek the dismissal of the Indictment as if it was a foregone conclusion about which all involved parties would be happy to sign off. For example, when the AUSA called the Court after getting approval to file the motion to dismiss the Indictment from the U.S. Attorney for the Eastern District of Michigan, there was a presumption that the Court would simply sign an order dismissing the Indictment because that is what the Government wanted. This attitude was evidenced by the fact that: (1) the AUSA was calling to let the Court know that it was going to dismiss the Indictment against Defendant, and (2) the AUSA wanted to confirm that they (the AUSA, defense counsel and Defendant) would not need to appear in Port Huron for the *Motion to Suppress hearing* the next morning.

When told by the Court Clerk that the undersigned would require the parties to attend the hearing the next day and that a written motion and proposed order needed to be submitted to the Court, the Government submitted a one-sentence, three-line "motion and brief" asking that the Court dismiss the Indictment. The "motion and brief" did not specify the grounds that supported the Government's request to dismiss the Indictment. The "motion and brief" did not specify whether the dismissal would be with or without prejudice, a distinction that the Court, but apparently not the Government (or at least the AUSA), finds critical when dismissing an Indictment. In addition, notwithstanding the title of the document (*i.e.*, "Motion and **Brief** to Dismiss Indictment"), no brief in support of the motion was filed. Similarly, the next day at the hearing, the AUSA was matter-of-fact regarding the Government's motion to dismiss Indictment and unapologetic regarding the manner in which he and the U.S. Attorney's Office for the Eastern District of Michigan handled the case. Disappointingly, the supplemental

brief submitted on February 9, 2011, nearly two weeks after the Court ordered the AUSA to submit it, is also matter-of-fact and unapologetic-to Defendant, whom the AUSA knew would continue to be in custody until the Government filed the supplemental brief, or the Court.

The Government's conduct as it affected the Court, namely waiting until the last minute to move to dismiss the Indictment and indicate there would be no need for a hearing on the Motion to Suppress, is nothing short of outrageous, irresponsible and intolerable. The Court could go on but there is a pressing matter the Court believes should be addressed promptly—the release of Defendant. The Court thus returns to deciding the issue presented by the Government's motion: whether to dismiss the Indictment with prejudice?

Although nothing the Government has submitted to the Court has convinced the Court that it is necessary to dismiss the Indictment against Defendant, the Court will not require the Government to prosecute, nor require a criminal defendant to defend, a criminal action that the Government will not zealously pursue, as is clearly the situation in this case. Accordingly, despite the Court's belief that the Motion to Suppress-and the case itself, if the Motion to Suppress had been denied-should have been resolved on the merits, the Court reluctantly grants the Government's Motion to Dismiss the Indictment With Prejudice.

## IV. CONCLUSION

Accordingly, and for the reasons stated above, the Court hereby ORDERS that the Government's Motion to Dismiss the Indictment With Prejudice (Docket # 27) is GRANTED. IT IS FURTHER OR-DERED that Defendant is to be released from custody immediately.

IT IS SO ORDERED.